***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon review of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Phoenix Insurance Company was the carrier on the risk for Lexington Furniture Industries, Inc./Lifestyle Furnishings International, Ltd., on the date of the alleged injury and until July 30, 2000.
3. The alleged date of injury and/or occupational disease is 1 July 2000.
4. An employment relationship existed between Plaintiff and Defendant-Employer at all relevant times.
5. Plaintiff's average-weekly wage will be determined by calculation on a properly completed Industrial Commission Form 22.
 ***********
Based upon all the competent evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, Plaintiff was 54 years of age. Plaintiff completed the eighth grade and part of the ninth grade. She has no other formal education. Plaintiff has worked in the furniture industry her whole career, having worked for United Furniture and Burlington Furniture from 1978 to 1986. Defendant-Employer hired Plaintiff in 1986 and she has worked there since.
2. Plaintiff worked for Defendant-Employer as a filler/glaze wiper in the Finishing Room. Defendant-Employer's production process involved employees designated as "first wipes," "second wipes," and "third wipes." Plaintiff spent approximately 90 percent of her time as "second wipe," five percent of her time as "third wipe," and five percent of her time reinstalling drawers into furniture cases.
3. As a wiper for Defendant-Employer, Plaintiff frequently used force and various repetitive motions. She also repeatedly reached up and around large pieces of furniture, lifted drawers, scrubbed and wiped. Plaintiff worked from below the waist to overhead, depending on the height, weight, and other dimensions of the various pieces of furniture. If a thicker consistency of glaze was used, more force was needed to create a smooth surface. Prior to her employment with Defendant-Employer, Plaintiff worked as a sprayer, wiper, finisher, and sander. These positions also involved repetitive use of her hands.
4. John Conrad, Corporate Director of Safety, Health and Environmental Affairs, testified that in the filler/glaze wiper position, the furniture goes through a spray booth. When it comes out, it is wiped at one station. As the furniture moves along the conveyor, another group continues wiping and then a third group wipes. He acknowledged that when the glaze filler dries, it is harder to wipe.
5. Plaintiff described the pace of her work as "high." The furniture continuously moved on a conveyor system. Plaintiff testified that when the solution sprayed onto the furniture was thick due to drying before being wiped, "You have a hard time getting it off and you have to scrub and scrub and scrub." Plaintiff's job also required her to use her hands and arms in awkward positions. She often had to reach overhead to grasp and wipe pieces of furniture.
6. Plaintiff worked with a variety of bedroom furniture, including tall and wide dressers and large chests with 18 drawers. There were usually eight to twelve people working on a line. However, there often would be only two employees on either side of the line, "because they don't have a lot of help all the time. They would be short of help most of the time . . . and they'll take your help away from you." Plaintiff testified that when they were short of help, the workers had to work even faster.
7. At the hearing, Defendants introduced a videotape and a written job description, both to which Plaintiff objected. Mr. Conrad admitted that the video introduced by Defendants did not include the first, second, and third wipe. Mr. Conrad testified that there are shortages of employees at times. The lines run at varying speeds but generally run at 12 feet per minute. The video shows the line moving at a slower rate. Dr. H. Boyd Watts, the only doctor shown the videotape during his deposition, testified that he didn't see the line move in the video. The film also did not show the instances where the solution has dried prematurely and workers have to scrub hard and fast to smooth the surface. The film showed the wiping line, fully staffed with workers. However, Plaintiff testified and Mr. Conrad conceded, that the line was not always fully manned. Mr. Conrad testified that in the event of a worker shortage, "You still have to get the same job done, no matter how many people are there[.]" Mr. Conrad also acknowledged that workers have to be in awkward positions when working on large pieces of furniture, including reaching around the furniture using different hand and arm motions to do the wiping.
8. While working for Burlington Industries, Plaintiff developed bilateral carpal tunnel syndrome in 1985 and had surgery on her right wrist by Dr. H. Boyd Watts. Plaintiff developed a recurrence of carpal tunnel syndrome in 1990 while working for Defendant-Employer and had surgery performed on her left wrist by Dr. Watts. Thereafter, she apparently fully recovered and continued working in the same capacity, having been released to regular duty. Plaintiff did not file a workers' compensation claim and was not told by a doctor that her carpal tunnel syndrome surgery was work-related.
9. On or about March 2000, Plaintiff began experiencing symptoms of bilateral hand numbness, tingling, and shooting pains up from her hands into her arms, which became progressively worse as she continued in her regular job. About two months later, on or about 1 May 2000, Plaintiff had difficulty reaching and placing a drawer in a shelf. She juggled and shifted the drawer and immediately felt a sharp electric-like shock run down her neck and down through her arms into her hands. Thereafter, she experienced progressive symptoms of generalized neck discomfort and some shoulder discomfort.
10. Plaintiff testified that she didn't realize at the time of experiencing the "shocking" sensation that she had sustained a neck injury, but thought that it was coming from her hands because she had been experiencing "shooting" pains in her arms prior to that incident.
11. Ms. Janette McGuinness, the plant nurse, admitted that part of her job as a company nurse is to assist in the defense of claims brought by employees and that her role in workers' compensation cases is not neutral. Plaintiff did not tell the nurse or manager that she felt the electric-type shock in her neck while putting in drawers at the time it occurred, but did tell Ms. McGuinness that it happened when working.
12. Ms. McGuinness set up an appointment with Dr. Watts, who had performed Plaintiff's prior surgery. Ms. McGuinness and "Sandra," the nurses who directed Plaintiff's medical care from inside the company, told Plaintiff that she could not file a workers' compensation claim for her injuries because they were not work-related.
13. Before she saw Dr. Watts, Plaintiff saw her family physician, Dr. William McKenzie, on 16 May 2000. She complained of generalized neck discomfort and numbness and tingling in her fingers. Dr. McKenzie's assessment was possible recurrent bilateral carpal tunnel syndrome and degenerative neck disease. Plaintiff was prescribed pain medicine. On 23 May 2000, Dr. McKenzie advised Plaintiff to see Dr. Watts to rule out cervical neck disease and for further definitive treatment of possible carpal tunnel syndrome.
14. Plaintiff saw Dr. Watts on 29 May 2000. She complained of recurrent bilateral carpal tunnel pain and numbness. Dr. Watts ordered tests, which were highly indicative of bilateral carpal tunnel syndrome. He performed a carpal tunnel release of Plaintiff's right wrist on 1 July 2000 and on her left wrist on 4 August 2000. In a 10 August 2000 medical note, Dr. Watts kept Plaintiff out of work until 28 August 2000. On 17 August 2000, Dr. Watts sent a note to Defendant-Employer requesting that Plaintiff be placed in a non-repetitive motion job because he was concerned that her condition would be aggravated.
15. On 11 September 2000, Plaintiff complained of numbness and tingling in her fingers. Nerve conduction tests ordered by Dr. Watts suggested a low level recurrence of carpal tunnel syndrome in Plaintiff's right wrist and borderline carpal tunnel syndrome in Plaintiff's left wrist.
16. Dr. Watts gave the opinion that Plaintiff's employment, which involved repetitive use of her hands and wrists, using her hands in awkward positions and forceful grasping, rubbing and scrubbing with her hands, together with her gender and age, significantly contributed to the development of her carpal tunnel syndrome. He also opined that Plaintiff's employment duties with Defendant-Employer, together with her gender and age, placed her at an increased risk of developing carpal tunnel syndrome as compared the general public not so employed. On 26 September 2000, Dr. Watts indicated that Plaintiff could return to work on 1 October 2000. Dr. Watts did not give any restrictions or ratings.
17. After Plaintiff returned to her regular position as filler wiper, her temporarily quieted neck symptoms returned and worsened and she continued to have significant bilateral carpal tunnel symptoms including pain and tingling in her hands.
18. On 27 October 2000, Plaintiff gave a recorded statement to the insurance adjuster, wherein she indicated that she thought the initial shock-type symptoms from her neck that went down into her upper extremities were related to her hands and not her neck, because she was still experiencing bilateral hand symptoms at the time of the recorded interview. Plaintiff's neck symptoms seemed to resolve after her carpal tunnel surgeries and during her recovery period until she returned to work.
19. Plaintiff presented to Dr. William Stephen Furr on 29 March 2001 with symptoms of bilateral hand pain including weakness, tingling, numbness, and shooting pains from her hands into her arms. She also complained of neck pain, shooting pains from the neck into the arms, and worsening pain in the shoulder. Dr. Furr ordered diagnostic studies, including EMG nerve conduction tests, a cervical MRI and an MRI of the shoulder.
20. Dr. Furr diagnosed Plaintiff with "Bilateral CTS, Severe DJD of C3-C4, C4-C5 with tightening of the spinal cord with pressure on the spinal cord and nerves coming out of the cord, post-surgical residuals materially aggravated by her employment, right shoulder impingement syndrome with edema of the shoulder, and Double-Crush Phenomenon." Dr. Furr explained that the Double-Crush Phenomenon was a condition where one has symptoms in the neck radiating into the arms and symptoms in the hands that radiate up the arms at the same time. This diagnosis was supported objectively by the diagnostic studies. In addition, Plaintiff had an overlapping of symptoms coming from the neck and shoulder.
21. Dr. Furr testified that the initial "electric-like" shocking sensations Plaintiff felt in her neck on or about 1 May 2000, which traveled to her arms and became progressively worse, were consistent with a specific traumatic injury to her neck. According to Dr. Furr, it is not uncommon for a neck injury to manifest itself in such a way that a person would not have realized that she had in fact injured her neck, especially where she was already having shooting pains in her arms and hands.
22. Over the course of March and April 2001, Plaintiff's shoulder, neck, and upper extremities condition worsened. On 24 April 2001, Dr. Furr stated that Plaintiff's severe cervical spondylosis at C3-4 and C4-5 could no longer be ignored and referred Plaintiff to Dr. Ranjan S. Roy, a neurosurgeon, for her neck problems.
23. Plaintiff first saw Dr. Roy on 8 May 2001, when she presented with neck pain that radiated into both shoulders, both arms and the thumb, index and middle finger of both hands. Plaintiff's symptoms were worse on her left side than her right side. Dr. Roy studied Plaintiff's films and diagnosed Plaintiff with severe tightness at C3-4 and C4-5 with mild to moderate stenosis at C5-6. On her right side, Plaintiff had a bulging disc at C6-7. Initial pain medication treatments were not effective.
24. On 24 August 2001, Dr. Roy performed an anterior cervical diskectomy and fusion at C3-4 and C4-5 on Plaintiff's neck. She was taken out of work for six weeks. On 4 September 2001, Plaintiff was no longer experiencing tingling in her arms or hands, but still had some right shoulder pain. On 17 October 2001, Plaintiff was no longer on pain medications; her neck pain and tingling had subsided; but she continued to experience deep and persisting pain in her right shoulder.
25. Plaintiff returned to work on 29 November 2001 with restrictions of maximum lifting of 20 pounds and limited elevation of her arm above the shoulder for three months. Dr. Roy did not give permanent restrictions or a rating.
26. Dr. Roy testified that Plaintiff had preexisting degenerative disc disease and cervical spondylosis. He opined that when Plaintiff reached up in May 2000 to put a drawer in a chest and immediately experienced an electric-like shocking sensation from her neck to her arms, she aggravated her preexisting disc problems.
27. Plaintiff returned to see Dr. Furr on 27 June 2002. She complained of pain in her right arm, right shoulder and neck. Dr. Furr ordered an MRI of Plaintiff's right shoulder and neck. On 15 July 2002, Dr. Furr noted that the MRI revealed an inflammation of Plaintiff's right rotator cuff. He diagnosed Plaintiff with severe rotator cuff/supraspinatus tendinosis of her right shoulder. Dr. Furr ordered epidural steroid injection therapy for Plaintiff's shoulder, which did not completely relieve her pain. Dr. Robert B. Wilson, an expert in pain management, provided the injections. Plaintiff attempted physical therapy, but it, too, was not effective. At Plaintiff's last visit on 30 September 2002, Dr. Furr prescribed an anti-inflammatory medicine.
28. Dr. Furr opined that the repetitive nature of Plaintiff's employment caused her carpal tunnel syndrome and her problems with her neck and shoulder. He further opined that Plaintiff's shoulder injury came either from repetitive motion or from the specific "shocking experience" Plaintiff sustained on or about 1 July 2000 when she reached up and placed a drawer in a chest. After discussing a description of Plaintiff's employment, Dr. Furr testified that Plaintiff's employment placed her at an increased risk of developing carpal tunnel syndrome and shoulder pathology impingement.
29. Dr. Wilson, who performed Plaintiff's shoulder injections, testified that Plaintiff complained of radiating pain in the right shoulder, right arm, both hands, and neck. Dr. Wilson diagnosed Plaintiff with post cervical laminectomy syndrome and myofacial pain of the neck and shoulder. He opined that Plaintiff's employment put her at an increased risk of developing carpal tunnel syndrome and stated that he would defer to Plaintiff's treating orthopedic surgeon regarding Plaintiff's carpal tunnel syndrome. Dr. Wilson noted that he did not treat Plaintiff for carpal tunnel syndrome; he treated her for her right shoulder and neck pain. Dr. Wilson opined that Plaintiff's degenerative neck problems were asymptomatic and preexisting. When asked to assume that Plaintiff's neck and shoulder became symptomatic after she reached up and placed the drawer into the chest and felt a shocking sensation, Dr. Wilson was of the opinion that Plaintiff's problems with her neck and shoulder, which he treated, were due to an exacerbation of her preexisting conditions.
30. Based on the greater weight of the evidence, in March 2000, Plaintiff contracted a recurrence of bilateral carpal tunnel syndrome, an occupational disease, as a result of the repetitive use of her hands and wrists, the awkward positions in which she used her hands and the forceful wiping, scrubbing and grasping she performed with her hands in her employment. Plaintiff's employment placed her at an increased risk of developing bilateral carpal tunnel syndrome than the general public not so employed. Due to her bilateral carpal tunnel syndrome and other work related conditions, Plaintiff was unable to work in any employment from 1 July 2000 through 28 August 2000.
31. Based on the greater weight of the evidence, on or about 1 May 2000, Plaintiff sustained a compensable injury to her neck as a direct result of a specific traumatic incident of the work assigned, arising out of and in the course of her employment when she reached up to place a drawer into a chest and immediately felt electric-like shocking sensations radiating from her neck to her arms. Due to her compensable neck injury, Plaintiff was unable to work in any employment from 24 August 2001, when she underwent surgery, through 29 November 2001.
32. Based on the greater weight of the evidence, in March 2000, Plaintiff contracted severe rotator cuff/supraspinatus tendinosis of her right shoulder, an occupational disease, as a result of the repetitive and awkward motions she performed in her employment including reaching overhead and grasping and wiping large pieces of furniture. Plaintiff's employment placed her at an increased risk of developing severe rotator cuff/supraspinatus tendinosis of her right shoulder over the general public not so employed.
33. The medical treatment Plaintiff underwent for her compensable bilateral carpal tunnel syndrome, severe rotator cuff/supraspinatus tendinosis and material aggravation of her preexisting, asymptomatic neck condition resulting in the need for surgery was reasonable and necessary.
34. Based on the Form 22 Statement Of Days Worked And Earnings Of Injured Employee submitted in this matter, Plaintiff's average weekly wage on 1 July 2000 was $355.45, yielding a compensation rate of $236.98.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff contracted recurrent bilateral carpal tunnel syndrome as a result of the repetitive use of her hands and wrists, the awkward positions in which she used her hands and the forceful wiping, scrubbing and grasping furniture she performed with her hands in her employment. Her bilateral carpal tunnel syndrome is due to causes and conditions characteristic of and peculiar to her employment with Defendant-Employer and is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, an occupational disease. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff sustained a specific traumatic incident to her neck arising out of and in the course of her employment as a direct result of the work assigned, which materially aggravated her preexisting degenerative disc disease and cervical spondylosis, when she reached up to place a drawer in a chest on or about 1 May 2000 and immediately felt an electric-like, shocking sensation radiate from her neck to both arms. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff contracted severe rotator cuff/supraspinatus tendinosis of her right shoulder as a result of the repetitive pressure on her hands, arms and shoulder when she reached to grasp, lift, wipe and scrub furniture while sometimes in awkward positions. Her severe rotator cuff/supraspinatus tendinosis of her right shoulder is due to causes and conditions characteristic of and peculiar to her employment with Defendant-Employer and is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, an occupational disease. N.C. Gen. Stat. § 97-53(13).
4. At the time of Plaintiff's injury by accident and contraction of an occupational disease, Plaintiff's average weekly wage was $355.45, yielding a compensation rate of $236.98. N.C. Gen. Stat. § 97-2(5).
5. As a result of her contraction of compensable occupational diseases and her injury by accident, Plaintiff is entitled to temporary total disability compensation at the rate of $236.98 per week for the following time periods: (a) from 1 July 2000 through 28 August 2000; and (b) from 24 August 2001 through 29 November 2001. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to the payment of all medical expenses incurred or to be incurred as a result of the compensable injury by accident and occupational diseases for so long as such treatment is necessary to effect a cure, provide relief, or lessen her disability. N.C. Gen. Stat. § 97-25.
7. Defendants are entitled to a credit against Plaintiff's total disability compensation for the amount Defendants have paid Plaintiff as part of an employer-funded disability plan. The deduction shall be calculated from payments made by Defendant-Employer in each week during which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation rate in any given week. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the deduction of attorney's fees hereinafter approved, Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $236.98 per week for the following time periods: (a) from 1 July 2000 through 28 August 2000; and (b) from 24 August 2001 through 29 November 2001. Said compensation has accrued and shall be paid in a lump sum.
2. Defendants shall receive a credit for the compensation to be paid to Plaintiff for the amount Defendants have paid Plaintiff as part of an employer-funded disability plan. Defendants' credit shall be deducted after the attorney's fee.
3. Defendants shall pay for all of Plaintiff's medical expenses incurred or to be incurred in the future, which are related to her compensable occupational disease and injury by accident when bills have been submitted according to Industrial Commission procedure.
4. A reasonable attorney fee in the amount of twenty-five percent (25%) of the compensation awarded to Plaintiff without deduction is approved and allowed for Plaintiff's counsel. The attorney fee shall be deducted from the accrued compensation due Plaintiff and paid directly to Plaintiff's attorney.
5. Plaintiff's entitlement to compensation for permanent partial disability, if any, is reserved for subsequent determination.
6. Defendants shall pay the costs.
This the ___ day of August 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER